DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**NORTH BROWARD HOSPITAL DISTRICT** d/b/a **BROWARD GENERAL MEDICAL CENTER; BARRY UNIVERSITY, INC.; ELEIDY MIEDES, SRNA; ROB ALEXANDER, M.D.; ANESCO NORTH BROWARD, LLC;** and **EDWARD PUNZALAN, CRNA;**
Appellants/Cross-Appellees,

v.

**SUSAN KALITAN,**
Appellee/Cross-Appellant.

Nos. 4D11-4806, 4D11-4833, and 4D11-4834

[July 1, 2015]

Consolidated appeals and cross-appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jack Tuter, Judge; L.T. Case No. 08-29706 19.

Heath & Carcioppolo, Chartered, Quintairos, Prieto, Wood & Boyer, P.A., Fort Lauderdale; Dinah Stein and Gary Magnarini of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, for appellants/cross-appellees North Broward Hospital District d/b/a Broward General Medical Center, Rob Alexander, M.D., Edward Punzalan, CRNA, and Anesco North Broward, LLC.

Jeffrey R. Creasman and Thomas A. Valdez of Quintairos, Prieto, Wood & Boyer, P.A., Tampa, for appellants/cross-appellees Barry University, Inc., and Eleidy Miedes, SRNA.

Crane Johnstone of Schlesinger Law Offices, P.A., Fort Lauderdale; Philip M. Burlington and Nichole J. Segal of Burlington & Rockenbach, P.A., West Palm Beach, for appellee/cross-appellant Susan Kalitan.

FORST, J.

In *Estate of McCall v. United States*, 134 So. 3d 894 (Fla. 2014), the Florida Supreme Court determined that the caps on noneconomic damages awards in *wrongful death cases*, imposed by section 766.118, Florida Statutes (2005), violated the equal protection clause of the Florida Constitution. Art. I, § 2, Fla. Const. The instant case consolidates three

appeals from a single medical malpractice incident with a final judgment finding Appellants, defendants below ("Defendants"), liable for the injuries and damages suffered by Appellee Susan Kalitan ("Plaintiff"). Plaintiff's jury-awarded damages were limited by the trial court's application of section 766.118, and Plaintiff's cross-appeal challenges the constitutionality of those caps.

Accordingly, this appeal presents an issue of first impression in the post-*McCall* legal environment—whether the opinion (or, more accurately, opinions) of the Florida Supreme Court in *McCall* dictates our holding that the caps on noneconomic damage awards in personal injury medical malpractice cases are similarly unconstitutional. Although Defendants attempt to distinguish the caps in wrongful death cases from those in personal injury cases, and there are clear distinctions, *McCall* mandates a finding that the caps in section 766.118 personal injury cases are similarly unconstitutional. To conclude otherwise would be disingenuous. Consequently, we reverse the trial court's decision below insofar as it reduced the jury's award of noneconomic damages based on the caps in section 766.118.

**Introduction**

In addition to Plaintiff's cross-appeal challenge to the constitutionality of the noneconomic damages caps, this case also involves Defendants' challenges to the apportionment of liability amongst the six defendants, as well as the determination that the noneconomic damages were caused by a "catastrophic injury." Our holding on the constitutionality of the caps renders several of the issues raised by Defendants on appeal moot. As for the one ruling still at issue, we reverse the final judgment with respect to its finding defendant Barry University ("University") vicariously liable for the conduct of defendant Edward Punzalan, CRNA ("the Nurse").

Our opinion will first present the events that led to Plaintiff's medical malpractice lawsuit. Second, we will review the trial court proceedings and decision. Third, we will discuss *McCall*, which addressed the constitutionality of noneconomic damages caps limiting awards in wrongful death actions. Fourth, we will apply *McCall*'s holding to the instant appeal. Fifth, we will address the University's liability for the Nurse's actions.

I. **Background**

In 2007, Plaintiff went to defendant North Broward Hospital District ("the Hospital") for outpatient surgery to treat carpal tunnel syndrome in

2

her wrist. The surgery required Plaintiff to be placed under general anesthesia. Defendant Dr. Robert Alexander ("the Anesthesiologist") was the anesthesiologist of record providing anesthesia care to Plaintiff during her surgery. The Anesthesiologist's team included the Nurse, as well as defendant Eleidy Miedes, a student nurse anesthetist from the University ("the Student"). All three individuals were present through the coordination of defendant Anesco North Broward, LLC ("Anesco"), a company that contracted with the Hospital to staff it with anesthesiologists and nurse anesthetists. Anesco also contracted with the University to facilitate the clinical training of the University's student registered nurse anesthetists ("SRNAs") at Anesco's affiliates, including the Hospital. At the time of the surgery, the Nurse was an employee of Anesco as a certified registered nurse anesthetist and an employee of the University as its clinical coordinator for the SRNA program.

During intubation, as part of the administration of anesthesia for Plaintiff's surgery, one of the tubes perforated Plaintiff's esophagus. Prior to the surgery and intubation, Plaintiff had no problems with her esophagus, nor did she complain of any bodily pain unassociated with her carpal tunnel. Plaintiff's hospital records do not indicate which member of the team actually intubated Plaintiff, but the Anesthesiologist testified that it was he, not the Nurse nor the Student, who performed the intubation.

When Plaintiff awoke in recovery, she complained of excruciating pain in her chest and back. The Anesthesiologist was notified, and, unaware of the perforated esophagus, he ordered the administration of a drug for the chest pain and concluded that there was no issue with Plaintiff's heart. Plaintiff was discharged from the hospital later that afternoon. Plaintiff's neighbor picked her up and drove her home.

The neighbor returned the next day to check on Plaintiff. Plaintiff was unresponsive, so the neighbor took her to the emergency room of a nearby hospital. Upon diagnosis of the problem, Plaintiff was rushed into life-saving surgery to repair her esophagus. Plaintiff's next memory was waking up in the intensive care unit after being in a drug-induced coma for several weeks. Plaintiff had additional surgeries and underwent intensive therapy to begin eating again and regain mobility. She testified that she continues to suffer from pain throughout the upper half of her body and from serious mental disorders as a result of the traumatic incident and the loss of independence because of her body's physical limitations following this incident.

## II. Plaintiff's Medical Malpractice Lawsuit

Plaintiff filed a medical negligence action against Defendants. The issues at trial encompassed personal liability and vicarious liability for Plaintiff's injuries, as well as the extent of the injuries and whether they amounted to "catastrophic injury" under section 766.118(1)(a). At the end of Plaintiff's case, all parties moved for directed verdict on various grounds. Primarily, Defendants contended that Plaintiff failed to meet the threshold for a determination of catastrophic injury. Plaintiff moved for directed verdict as to the University's liability for the Nurse's actions, but the University objected, arguing that Plaintiff never had alleged such a claim in the case.

Ultimately, the trial court decided to submit these two highly contested issues to the jury as questions on the verdict form. With respect to the University's vicarious liability for the Nurse, the jury was asked whether the Nurse was acting as the University's agent or employee when he was supervising the Student during the administration of the anesthesia to Plaintiff. With regard to catastrophic injury, the jury was asked to determine whether Plaintiff suffered a "permanent impairment constituted by either . . . [s]pinal cord injury involving severe paralysis of an arm, a leg, or the trunk . . . [or] [s]evere brain or closed-head injury evidenced by a severe episodic neurological disorder."

The jury found in Plaintiff's favor and apportioned liability as directed on the verdict form. The jury also found that the Nurse was acting as the University's agent or employee when supervising the Student during the administration of anesthesia to Plaintiff. Finally, the jury determined that Plaintiff suffered catastrophic injury in the form of a "[s]evere brain or closed-head injury evidenced by a severe episodic neurological disorder" and awarded Plaintiff $4,718,011 in total damages. The noneconomic damage awards were $2 million for past pain and suffering and $2 million for future pain and suffering.

Multiple post-trial motions were filed, with Defendants primarily challenging the jury's finding of catastrophic injury by way of severe brain or closed-head injury. Defendants argued that there was no evidence in the record to support the jury's finding of such an injury. The University also challenged the finding of an agency relationship with the Nurse in light of the fact that Plaintiff never had pled vicarious liability between those parties. All motions challenging the finding of catastrophic injury and the vicarious liability issue were denied. The court also rejected Plaintiff's challenge that the section 766.118 caps on noneconomic damages in medical negligence actions were unconstitutional.

4

The trial court issued a written final judgment as to damages. The final judgment provided that the University was responsible, along with the Nurse and Anesco, for the sum attributable to the Nurse's percentage of liability. The court also limited the noneconomic damage awards by the caps provided in section 766.118, Florida Statutes (2011), after applying the increased cap for the finding of catastrophic injury, because the court found that competent substantial evidence existed in the record to support a finding of catastrophic injury under the statutory definition as determined by the jury. As such, the noneconomic damages award of $4 million was reduced by close to $2 million by the "[l]imitation on noneconomic damages for negligence of practitioners" under section 766.118(2) and "[l]imitation on noneconomic damages for negligence of nonpractitioner defendants" under section 766.118(3), Florida Statutes (2011). Furthermore, the noneconomic damages award was further reduced by about $1.3 million, as the Hospital's share of liability was capped at $100,000 by virtue of the hospital's status as a sovereign entity. § 768.28, Fla. Stat. (2007). The instant appeals followed.

## III. *Estate of McCall v. United States*

Michelle McCall received prenatal medical care at a United States Air Force clinic. *Estate of McCall v. United States*, 642 F.3d 944, 946 (11th Cir. 2011). Because of the negligence of the Air Force doctors and nurses during childbirth, Ms. McCall died. *Id.* at 947. The petitioners (the estate of Ms. McCall, Ms. McCall's parents, and the father of Ms. McCall's son) filed an action against the United States under the Federal Tort Claims Act. *Id.* at 946-47. The United States District Court for the Northern District of Florida determined that the petitioners' economic damages, or financial losses, amounted to $980,462.40. *Id.* at 947. The district court concluded that the petitioners' noneconomic damages totaled $2 million, including $500,000 for Ms. McCall's son and $750,000 for each of her parents. *Id.* The district court, however, limited the petitioners' aggregate recovery of wrongful death noneconomic damages to $1,000,000 upon application of section 766.118(2), Florida Statutes (2005). *Id.* at 947-48.

The district court rejected the petitioners' challenge to the constitutionality of Florida's statutory noneconomic damages caps in wrongful death cases. *Id.* at 947. On appeal to the Eleventh Circuit, the petitioners challenged the district court's rulings with regard to "both the application and the constitutionality of Florida's cap[s] on noneconomic damages for medical malpractice claims." *Id.* at 948. The Eleventh Circuit affirmed the application of the caps on noneconomic damages and held that the statute does not violate either the Equal Protection Clause or the Takings Clause of the United States Constitution. *Id.* at 949-53. The

5

Eleventh Circuit, however, granted the petitioners' motion to certify four questions to the Florida Supreme Court regarding the remaining challenges to the statutory caps under the Florida Constitution. *Id.* at 952-53.

The sole question addressed by the Florida Supreme Court's plurality and concurring opinions in *McCall* was whether the statutory caps on wrongful death noneconomic damages under section 766.118 violate the right to equal protection guaranteed by the Florida Constitution. *McCall*, 134 So. 3d at 900. Five justices agreed that the caps violate the right to equal protection under our state constitution. As their analyses compel our holding in the instant case, we discuss them at length below.

## A. The Plurality Opinion

The plurality opinion, written by Justice Lewis and joined by Justice Labarga, began by directing attention to whether there was an equal protection violation. Justice Lewis concluded that the caps "irrationally impact[] circumstances which have multiple claimants/survivors differently and far less favorably than circumstances in which there is a single claimant/survivor." *Id.* at 901. Under the statutory scheme, "the greater the number of survivors and the more devastating their losses are, the less likely they are to be fully compensated for those losses." *Id.* at 902. To assist in illustrating the arbitrariness of the caps, Justice Lewis borrowed a hypothetical from the Supreme Court of Illinois that, like the case before us, involves caps on the amount an individual victim can be awarded for noneconomic injuries:

> [T]hree plaintiffs are injured as a result of the same tortfeasor's negligence. Plaintiff A is injured moderately, and suffers pain, disability and disfigurement for a month. Plaintiff B is severely injured and suffers one year of pain and disability. Plaintiff C is drastically injured, and suffers permanent pain and disability. . . . [I]t is further assumed that a jury awards plaintiffs A and B $100,000 in compensatory damages for noneconomic injuries. Plaintiff C receives $1 million for his permanent, lifelong pain and disability.
>
> *With respect to plaintiff C, [the challenged legislation] arbitrarily and automatically reduces the jury's award for a lifetime of pain and disability, without regard to whether or not the verdict, before reduction, was reasonable and fair.*

6

> The tortfeasors in this example are also treated differently, without any justification. The tortfeasor who injures plaintiffs A and B is liable for the full amount of fairly assessed compensatory damages. In contrast, [the challenged legislation] *confers a benefit on the similarly situated tortfeasor who injures plaintiff C. This tortfeasor pays only a portion of fairly assessed compensatory damages because of the limitation [on noneconomic damages].* Therefore, the statute discriminates between slightly and severely injured plaintiffs, and also between tortfeasors who cause severe and moderate or minor injuries.

*Id.* at 902-03 (emphasis in original) (quoting *Best v. Taylor Mach. Works*, 689 N.E. 2d 1057, 1075 (Ill. 1997)). The plurality opinion stressed the "arbitrary and invidious discrimination between" claimants prior to conducting "a comprehensive equal protection analysis of the cap[s] on damages in section 766.118 . . . to resolve the certified question." *Id.* at 905.

Pursuant to the first prong of the rational basis test, the plurality opinion analyzed "'whether the challenged statute serves a legitimate governmental purpose.'" *Id.* at 905 (quoting *Warren v. State Farm Mut. Auto. Ins. Co.*, 899 So. 2d 1090, 1095 (Fla. 2005)). It concluded that "the Legislature's determination that the 'the increase in medical malpractice liability insurance rates is forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine' is unsupported." *Id.* at 909 (quoting Ch. 2003–416, § 1, Laws of Fla., at 4035).

Although the plurality did not expressly conclude that there was no legitimate public purpose for enacting the caps originally, the plurality opinion's discussion of the evidence points toward this conclusion. However, in addressing the second prong of the rational basis test, the next portion of the plurality opinion advanced on the assumption that there was a legitimate public purpose ("a dangerous risk of physician shortage due to malpractice premiums") when the statute was enacted, and then questioned whether there *currently* exists "a rational relationship between a cap on noneconomic damages and alleviation of the purported [medical malpractice] crisis." *Id.* at 909. The plurality opinion found that "the available evidence fails to establish" such a legitimate relationship, *id.*, as "[r]eports have failed to establish a direct correlation between damages caps and reduced malpractice premiums." *Id.* at 910.

Finally, the plurality opinion discussed the *current* status of medical malpractice in Florida, noting that "[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." *Id.* at 913 (quoting *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547-48 (1924)). The plurality opinion determined that,

> [E]ven if there had been a medical malpractice crisis in Florida at the turn of the century, the current data reflects that it has subsided. No rational basis currently exists (if it ever existed) between the cap imposed by section 766.118 and any legitimate state purpose. At the present time, the cap on noneconomic damages serves no purpose other than to arbitrarily punish the most grievously injured or their surviving family members.

*Id.* at 914-15 (citation omitted). The plurality opinion concluded that the cap on wrongful death noneconomic damages "does not pass constitutional muster," *id.* at 915, as the cap "fails the rational basis test and violates the Equal Protection Clause of the Florida Constitution." *Id.* at 912.

## B. The Concurring Opinion

Justice Pariente, joined by Justices Quince and Perry, authored a concurring opinion asserting "that the noneconomic damages cap violates Florida's Equal Protection Clause as applied to wrongful death actions under the constitutional rational basis test." *See id.* at 918 (Pariente, J., concurring). The concurring opinion, in relevant part, began with the declaration that "the only asserted legitimate State interest is the alleviation of rising medical malpractice insurance premiums paid by the affected doctors. However . . . there is no mechanism in place to assure that savings are actually passed on from the insurance companies to the doctors." *Id.* at 919 (citing to plurality opinion at 911-12). Additionally, the concurring opinion "strongly agree[d]" with the plurality opinion that a medical malpractice crisis no longer exists. *Id.* at 920-21.

## C. Points of Agreement among the Five Justice Majority

In summary, five of the seven justices[1] in *McCall* held that the noneconomic damages caps encompassed in section 766.118, as applied

---

[1] Justice Polston wrote a dissenting opinion, joined by Justice Canady.

to wrongful death actions, violate the Equal Protection Clause of the Florida Constitution. The two opinions for the five-justice majority conclude that, even assuming there was a legitimate interest when section 766.118 was enacted, "the current data reflects that it has subsided" and no legitimate interest remains. *Id.* at 914 (Lewis, J., plurality opinion); *see also id.* at 920 (Pariente, J., concurring).[2]

## IV. Application of *McCall* to Personal Injury Medical Malpractice Damage Awards

### A. Standard of Review

The determination of a statute's constitutionality is a question of law, and, therefore, is subject to *de novo* review. *City of Fort Lauderdale v. Gonzalez*, 134 So. 3d 1119, 1121 (Fla. 4th DCA 2014). As such, "no deference is given to the judgment of the lower court[]." *D'Angelo v. Fitzmaurice*, 863 So. 2d 311, 314 (Fla. 2003).

### B. Analysis

As mandated by the Florida Constitution, "All natural persons, female and male alike, are equal before the law . . . ." Art. I, § 2, Fla. Const. Accordingly, "everyone is entitled to stand before the law on equal terms with, to enjoy the same rights as belong to, and to bear the same burden as are imposed upon others in a like situation." *McCall*, 134 So. 3d at 901 (quoting *Caldwell v. Mann*, 26 So. 2d 788, 790 (Fla. 1946)).

Because the damage caps do not implicate either a suspect class or fundamental right, we utilize, consistent with the plurality and concurring opinions in *McCall*, the rational basis test to discern the caps' constitutionality. *Id.* To maintain constitutionality under the rational basis test, "a statute must bear a rational and reasonable relationship to a legitimate state objective, and it cannot be arbitrary or capriciously imposed." *Id.* (citing *Dep't of Corrs. v. Fla. Nurses Ass'n*, 508 So. 2d 317, 319 (Fla. 1987)).

---

[2] The concurring opinion took note of the plurality opinion's discussion of subdivision (8) of the statute that "appear[ed] to compel medical malpractice insurance companies to reduce their rates in response to the 2013 legislation[.]" *McCall*, 134 So. 3d at 911 (discussing § 627.062(8), Fla. Stat. (2003)). Both opinions noted that, by 2011, subdivision (8) had been repealed from the statute, "having been designated 'obsolete' by the Legislature." *Id.* at 912 (referencing Ch. 2011-39, § 12, Laws of Fla., at 514, 536-37).

The Florida Legislature, in passing section 766.118, found that "Florida [was] in the midst of a medical malpractice insurance crisis of unprecedented magnitude." Ch. 2003–416, § 1, Laws of Fla., at 4035. However, the *McCall* concurring opinion (noting agreement with the plurality opinion) concluded that the medical malpractice "crisis" no longer exists and, consequently, there is no justification for "the arbitrary reduction of survivors' noneconomic damages in wrongful death cases based on the number of survivors . . . without any commensurate benefit to the survivors and without a rational relationship to the goal of reducing medical malpractice premiums." *McCall*, 134 So. 3d at 921 (Pariente, J., concurring).

Although *McCall's* plurality and concurring opinions specifically addressed only the caps on noneconomic damages awarded to survivors in wrongful death actions, section 766.118 applies to both personal injury and wrongful death actions. *See* § 766.118(2)(a), Fla. Stat. (2011). Because addressing the medical malpractice crisis was the Legislature's stated objective when passing section 766.118, if the objective no longer exists, then there is no longer a "legitimate state objective" to which the caps could "rational[ly] and reasonabl[y] relat[e]." *McCall*, 134 So. 3d at 901. Per the *McCall* plurality and concurring opinions, we are compelled to conclude that section 766.118 presently lacks a rational and reasonable relation to any state objective, and thus fails both the concurring opinion's "smell test" as well as the rational basis test. *Id.* at 920 (Pariente, J., concurring).

Therefore, adhering to *McCall*, the section 766.118 caps are unconstitutional not only in wrongful death actions, but also in personal injury suits as they violate equal protection. It makes no difference that the caps apply horizontally to multiple claimants in a wrongful death case (as in *McCall*) or vertically to a single claimant in a personal injury case who suffers noneconomic damages in excess of the caps (as is the case here). Whereas the caps on noneconomic damages in section 766.118 fully compensate those individuals with noneconomic damages in an amount that falls below the caps, injured parties with noneconomic damages in excess of the caps are not fully compensated.

Due to the equal protection analysis and application of *McCall* to medical malpractice cases, we need not address Plaintiff's additional claims regarding access to courts or right to jury trial.

## C. Retroactivity of *McCall*

10

Defendants have argued in their briefs that, in the event this court finds *McCall* is applicable to personal injury cases, we should not apply that ruling retroactively and instead "the decision should apply prospectively only to actions that have not yet been filed." *McCall* is silent as to whether the decision applies to pending cases or prospectively only. The Florida Supreme Court "has the sole power to determine whether [its] decision should be prospective or retroactive in application." *Benyard v. Wainwright*, 322 So. 2d 473, 474 (Fla. 1975) (citing *Linkletter v. Walker*, 381 U.S. 618 (1965)). In each of the cases cited by Defendants in support of their prospective application argument, the Florida Supreme Court explicitly determined that its decision should be applied prospectively. *See, e.g., Martinez v. Scanlan*, 582 So. 2d 1167, 1176 (Fla. 1991); *Aldana v. Holub*, 381 So. 2d 231, 238 (Fla. 1980); *Interlachen Lakes Estates, Inc. v. Snyder*, 304 So. 2d 433, 435 (Fla. 1973); *Gulesian v. Dade Cnty. Sch. Bd.*, 281 So. 2d 325, 326-27 (Fla. 1973). In none of these cases did a District Court of Appeal limit a Supreme Court decision after-the-fact. *Accord Fla. Elks Children's Hosp. v. Stanley*, 610 So. 2d 538, 541 (Fla. 5th DCA 1992) (holding that it would not apply a Supreme Court decision prospectively where the court itself had not done so expressly).

Here, the Supreme Court in *McCall* did not limit its holding to prospective application. Moreover, the Fifth District Court of Appeal recently withdrew its opinion in a wrongful death case for the purpose of applying *McCall* retroactively. *Shoemaker v. Sliger*, 141 So. 3d 1225 (Fla. 5th DCA 2014). Finally, Florida's "pipeline rule" requires that "disposition of a case on appeal should be made in accord with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered." *Hendeles v. Sanford Auto Auction, Inc.*, 364 So. 2d 467, 468 (Fla. 1978); *see also Stanley*, 610 So. 2d at 541-42. Accordingly, we apply the dictates of *McCall* to the instant case.

## V. The University's Vicarious Liability for the Nurse's Actions

The University maintains that the trial court erred in submitting to the jury the question of an agency relationship between itself and the Nurse at the time of the surgery. "A trial court is accorded broad discretion in formulating appropriate jury instructions and its decision should not be reversed unless the error complained of resulted in a miscarriage of justice or the instruction was reasonably calculated to confuse or mislead the jury." *Barton Protective Servs., Inc. v. Faber*, 745 So. 2d 968, 974 (Fla. 4th DCA 1999)).

Generally, a defendant cannot "be found liable under a theory of vicarious liability that was not specifically pled." *Goldschmidt v. Holman*,

571 So. 2d 422, 423 (Fla. 1990) (relying on *Tamiami Trail Tours, Inc. v. Cotton,* 463 So. 2d 1126 (Fla. 1985)); *see also Gen. Asphalt Co. v. Bob's Barricades, Inc.,* 22 So. 3d 697, 699 (Fla. 3d DCA 2009) ("Florida law is clear that in order to pursue a vicarious liability claim, the claimant must specifically plead it as a separate cause of action."). Florida Rule of Civil Procedure 1.110(b) requires a complaint to contain "a short and plain statement of the ultimate facts showing that the pleader is entitled to relief."

The exception to pleading the claim is trial by consent under Florida Rule of Civil Procedure 1.190(b), which states, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." "An issue is tried by consent when there is no objection to the introduction of evidence on that issue." *Scariti v. Sabillon,* 16 So. 3d 144, 145-46 (Fla. 4th DCA 2009) (quoting *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.,* 842 So. 2d 881, 887 (Fla. 4th DCA 2003)). However, the Second District, in a detailed opinion on the issue, has noted that, "in at least some cases[,] the mere failure of the opposing party to make an objection at one isolated juncture of the case, whether due to mistake or momentary lapse of attentiveness, may not be enough to establish that party's consent under rule 1.190(b)." *Smith v. Mogelvang,* 432 So. 2d 119, 124 (Fla. 2d DCA 1983). The court noted that "in a particular case in order to show implied consent, the circumstances should establish lack of unfairness to, or some true acquiescence by, the party opposing the new issue." *Id.* at 125.

Whereas Plaintiff in the instant case specifically pled vicarious liability between other parties in the operative complaint, Plaintiff did not make any such specific claim for the University's vicarious liability for the Nurse. Specifically, Plaintiff failed to present "a short and plain statement of the ultimate facts" to show that the Nurse was acting as the University's agent or employee when the Nurse was supervising the Student during the administration of anesthesia in Plaintiff's surgery. *See* Fla. R. Civ. P. 1.110(b). As such, the issue could be raised at trial only through consent of the parties. Fla. R. Civ. P. 1.190(b).

The record clearly evidences that the University did not expressly agree to try the issue and any claim of implied consent fails. Throughout the presentation of Plaintiff's case, no evidence was offered specifically to connect the Nurse's actions in the operating room to his employment as the University's clinical coordinator, but rather the testimony revealed that the Nurse was engaged in his employment with Anesco during that time.

12

At the end of Plaintiff's case, Plaintiff read into evidence an admission from the University during discovery: "As to the defendant, Barry University, it's admitted that [the Nurse] was acting within his capacity as clinical coordinator on behalf of Barry University, Inc., at all times he was supervising [the Student] at all times he was involved in the rendition of anesthesia services to [Plaintiff] at [the Hospital] on November 6th, 2007." The University made no objection to this admission being read; however, the University objected as soon as Plaintiff relied on the admission in moving for directed verdict on the issue of the University's vicarious liability for the Nurse. The University maintained that the issue was improper where it had not been pled and explained that the admission was meant to admit that the Nurse was the clinical coordinator at the time of the surgery and not an admission to vicarious liability, which the University denied during discovery. Although the University failed to object at the time the admission was read into evidence, this "mistake or momentary lapse of attentiveness" would not be enough to allow trial by implied consent where the University objected as soon as Plaintiff's intentions with the admission were made clear. *See Smith*, 432 So. 2d at 124. Therefore, we reverse the decision in the final judgment holding the University liable, along with the Nurse and Anesco, for the damages award against the Nurse.

**Conclusion**

Per *McCall*, Plaintiff's noneconomic damages were improperly limited by the application of the caps in section 766.118 and, accordingly, we reverse the noneconomic damages award in the final judgment. Defendants have asked this court to distinguish single claimant personal injury cases from the multiple claimant wrongful death situation addressed in *McCall*. However, we have found no basis to do so that would not conflict with the reasoning of the Florida Supreme Court's plurality and concurring opinions, which strike at the underpinning of the Legislature's caps on noneconomic damages in general. So long as the caps discriminate between classes of medical malpractice victims, as they do in the personal injury context (where the claimants with little noneconomic damage can be awarded all of their damages, in contrast to those claimants whose noneconomic damages are deemed to exceed the level to which the caps apply), they are rendered unconstitutional by *McCall*, notwithstanding the Legislature's intentions.

The trial court is directed to reinstate the total damages award as found by the jury, though these damages may still be limited by the doctrine of sovereign immunity. Also, in the corrected final judgment, the University is not to be held liable for the damages attributable to the Nurse. As no

challenge was raised as to liability in any other context, nor was a challenge raised regarding Plaintiff's economic damages award, those portions of the final judgment are affirmed.

*Reversed in part; affirmed in part.*

CIKLIN, C.J., and STEVENSON, J., concur.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***